**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JONATHON R. WYATT,                                  Case No. 1:16-cv-938

        Plaintiff,                                        Black, J.
                                                    Bowman, M.J.

    v.


COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Jonathon Wyatt filed this Social Security appeal in order to challenge the

Defendant's findings that he is not disabled.  *See* 42 U.S.C. §405(g).  Appealing to this

Court for the second time, Plaintiff argues that the Commissioner failed to comply with

this Court's prior Remand Order.  As explained below, I disagree, and conclude that the

ALJ's finding of non-disability should be AFFIRMED, because it is now supported by

substantial evidence in the administrative record.

### I.  Standard of Review

Before delving into the extensive record of this case, it is helpful to review the

applicable standard of review.  To be eligible for benefits, a claimant must be under a

"disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §1382c(a).

Narrowed to its statutory meaning, a "disability" includes only physical or mental

impairments that are both "medically determinable" and severe enough to prevent the

1

applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's

impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he or she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him or her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## II. Summary of Administrative Record

The administrative record in this case is lengthy. In addition to a prior Report and Recommendation ("R&R") and Remand Order from this Court, the record contains three consecutive decisions by Administrative Law Judges ("ALJs"). In his current appeal, Plaintiff challenges the last ALJ's decision, alleging that the Commissioner failed to comply with the Court's directives on remand.

Plaintiff filed the application on which this appeal is based nearly a decade ago, seeking Supplemental Security Income ("SSI") benefits. In his 2007 application, Plaintiff alleged a disability onset date of October 17, 2005, when Plaintiff was 25 years old.[1] Despite his relative youth, since reaching adulthood Plaintiff has worked only "under the table," with no substantial gainful employment.[2] (Tr. 445).

After Plaintiff's 2007 claims were denied initially and upon reconsideration, he requested a hearing *de novo* before an ALJ. On December 11, 2009, ALJ Amelia Lombardo held Plaintiff's first evidentiary hearing, during which Mark Oberlander, Ph.D., testified as a medical expert.[3] (Tr. 34-66). Notably,[4] Dr. Oberlander opined that Plaintiff's mental impairments met or equaled the requirements for Listings 12.02 (organic mental disorders), 12.04 (affective disorders), 12.06 (anxiety disorders), 12.08 (personality disorders) and/or 12.09 (substance addiction disorders). (Tr. 46, 653).

On May 28, 2010, ALJ Lombardo denied Plaintiff's application in the first of three adverse decisions contained in the record. (Tr. 10-26). ALJ Lombardo found that Plaintiff had severe mental impairments of a bipolar disorder, substance abuse, and borderline intellectual functioning. (Tr. 12). However, she determined that none of Plaintiff's impairments met or equaled a Listing. Generally, to satisfy a mental health

---

[1]Plaintiff filed two prior applications for SSI in 2002 and in 2006. Both applications were denied. Plaintiff's 2007 application lists an onset date as 10/17/05, but also asserts that Plaintiff became disabled prior to the age of 22.

[2]Plaintiff earned his highest earnings, at the age of 21, when he reported $2,065.74. Since then, Plaintiff has reported no earnings, except for $56 in 2007 and $452.95 in 2014. (Tr. 445).

[3]Despite being mistakenly identified in the record at times as a medical doctor (M.D.), Dr. Oberlander is a psychologist, having obtained a Ph.D. in Clinical & Counseling Psychology in 1967. (*See, e.g.*, Tr. 428-429).

[4]Cases presented on judicial appeal rarely involve testimony from an agency consultant that a plaintiff meets or equals a single Listing, much less five Listings.

Listing, a claimant must establish at least "marked" limitations in two of three functional categories (activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace) or, alternatively, one "marked" limitation and repeated episodes of decompensation, each of extended duration.[5] The referenced criteria are commonly called the "paragraph B" criteria.

In her assessment of the B criteria, ALJ Lombardo found that Plaintiff had no marked limitations and no extended episodes of decompensation. She determined that Plaintiff retains the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, though she included non-exertional limitations to accommodate his mild-to-moderate mental limitations. (Tr. 17). She found that Plaintiff remained capable of performing multiple jobs and was not disabled. (Tr. 25). After the Appeals Council denied review, Plaintiff appealed to this Court, claiming that the ALJ had erred by failing to find, at Step 3 of the sequential analysis, that Plaintiff met or equaled a Listing. In a related claim, Plaintiff asserted that the ALJ erred in weighing the opinion evidence.

In an R&R filed on May 28, 2013, the undersigned agreed that ALJ Lombardo had "improperly evaluated the evidence of record in determining that Plaintiff did not meet any of the Listings for mental impairments," concluding that the ALJ's "evaluation of Plaintiff's mental impairments did not comport with agency regulation and controlling law." (Tr. 662, 672). The R&R identified three errors. First, the Court found that the ALJ had improperly rejected the opinions of an examining consultant, Dr. Sparks, simply

---

[5]Under the relevant regulations, limitations in the four functional areas listed in paragraph B are rated "none, mild, moderate, marked, or extreme." 20 C.F.R. §404.1520a(c).

because they were based on Plaintiff's self-reports. (*See* Tr. 675-676, citing *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989)). Second, in determining Plaintiff's social functioning,[6] the undersigned found that the ALJ improperly focused on Plaintiff's daily activities "in isolation" without evaluating "Plaintiff's statements and testimony as a whole." (Tr. 676, *see also* Tr. 678-679, reasoning that the ability to perform "limited activities" does not by itself constitute substantial evidence that a claimant's symptoms are not disabling). Third, the undersigned was troubled by ALJ Lombardo's rejection of Dr. Oberlander's opinions as "wholly inconsistent with the record evidence," (Tr. 674), concluding that the ALJ had "ignore[d] the objective findings of record," including substantial evidence that "related to" Plaintiff's mental impairments, such as clinical reports of "racing thoughts, loose thought process, angry effect, crying spells, rapid speech, hyper-verbal, hyperactive, irritable, poor concentration, elated mood, manic episodes, pressured speed and labile effect." (Tr. 677-678, footnote omitted).

Based on the referenced errors, the R&R concluded that the ALJ had "improperly evaluated the evidence relating to the paragraph B criteria in determining that Plaintiff did not meet or equal any of the Listing[s] related to mental impairments." (Tr. 679). Finding that "[a]ll essential factual issues have not been resolved," the undersigned remanded. The R&R directed the ALJ to:

---

[6]The R&R contains a typographical error in that it states that ALJ Lombardo found Plaintiff to be "only moderately limited in social functioning." (Tr. 676). ALJ Lombardo actually found Plaintiff to be mildly restricted in social functioning, but moderately limited in concentration, persistence and pace. (Tr. 14).

1) Properly assess and evaluate the opinion evidence, and provide a clear explanation for the conclusions reached; and 2) reevaluate whether Plaintiff's impairments meet or equal listings 12.02, 12.04, 12.06, 12.08 and/or 12.09.

(Tr. 679-680).

Plaintiff filed objections to the R&R, seeking an immediate award of benefits. The Commissioner filed a response in opposition, pointing out that most of the clinical findings noted in the R&R were based on Plaintiff's own reports, but that significant inconsistent statements made by Plaintiff provided "ample reason to question Plaintiff's reports." (Doc. 17 at 3, n.2. in Case No. 1:12-cv-289) Defendant's response also pointed out many other inconsistencies in the record, including but not limited to those relating to Plaintiff's extensive drug and alcohol use.

On August 13, 2013, U.S. Senior District Judge Beckwith overruled Plaintiff's objections to the R&R, agreeing with the Commissioner that an immediate award of benefits was not appropriate. The Court's analysis recognizes the existence of significant evidence that could support a denial of SSI on remand, notwithstanding the legal errors that required remand for further development of the record. For example, the Court recognized the absence of any controlling opinions from treating physicians that Plaintiff had marked limitations in two or more of the B criteria, and that multiple agency consultants had opined that Plaintiff had only mild to moderate mental impairments that did not meet the B criteria. The Court's Remand Order further noted that examining psychologist Dr. Schulz "submitted an opinion which reasonably supports a finding that Plaintiff's impairments do not meet the 'B criteria.'" Last, the

Court reasoned that even though the ALJ was not permitted to reject opinions <u>solely</u> because they were based on subjective reports,

> it is nevertheless true that the quality of those opinions depends on Plaintiff's capacity to be a reliable and accurate historian. "An ALJ may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self-reports that have been properly discounted as incredible." *Tornmaseth v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Morgan v. Commissioner Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)). In other words, the ALJ cannot reject medical opinions based on the subjective reports of the claimant solely because they are based on the subjective reports of the claimant. As Judge Bowman pointed out, reliance on the patient's self-reports is a clinically acceptable diagnostic technique in the field of psychology. **The ALJ may, however, reject medical opinions based on the patient's self-reports where the reports themselves lack credibility or where the claimant is not credible. In this case, as the Commissioner sets forth in detail in her brief, there are [a] number of credibility issues surrounding Plaintiff's subjective reports to the examining psychologists.** The ALJ - not the Court – is responsible for resolving those credibility issues and re-evaluating the weight to which opinions based on Plaintiff's self-reports are entitled.

(Tr. 657-658, emphasis added).

On July 3, 2014, ALJ Lombardo conducted a second evidentiary hearing, after which she issued a second adverse decision. (Tr. 558-58, 689-709). However, on October 27, 2015, the Appeals Council vacated that decision after concluding that ALJ Lombardo had failed to comply with this Court's remand order, and "repeated the same rationale that the court rejected without further explanation." (Tr. 721). The Appeals Council found that the second decision provided a rationale that was "identical" to the first, and "did not provide [any] additional rationale or sufficiently explain why the claimant's subjective complaints were unreliable." (Tr. 722). ALJ Lombardo again had

failed to "properly evaluate the paragraph B criteria," particularly Plaintiff's social functioning. (*Id.*)

Based upon the repeated errors, the Appeals Council directed that Plaintiff's case be assigned to a new ALJ. In light of the lapse of so many years, the Appeals Council also directed the new ALJ to obtain a new consultative examination and medical source statements, to obtain evidence from a new medical expert "if necessary," and to re-evaluate the medical opinion evidence. (Tr. 723). The ALJ was directed to further evaluate Plaintiff's subjective complaints, to re-assess Plaintiff's RFC, and to obtain new evidence from a vocational expert if warranted. (Tr. 723-724).

On February 25, 2016, Plaintiff's final evidentiary hearing was held before ALJ Eric Anschuetz. (Tr. 483-557). On March 16, 2016, ALJ Anschuetz issued a lengthy written decision, in which he concluded for the third time that Plaintiff is not currently disabled, and has not been disabled since September 11, 2007. (Tr. 440-471).

At Step 2 of the sequential analysis, ALJ Anschuetz found severe impairments of "affective (bipolar) disorder, attention deficit hyperactivity disorder (ADHD), substance use disorder involving drugs and alcohol, personality disorder, borderline intellectual functioning, residuals of inguinal hernia repair (times two), residuals of left shoulder arthroscopic surgery." (Tr. 445).[7] Consistent with ALJ Lombardo's prior decisions, however, ALJ Anschuetz found that Plaintiff's impairments did not meet or equal any Listing. (Tr. 462-464). The ALJ determined that Plaintiff had a more restrictive RFC

---

[7]ALJ Anschuetz's Step 2 findings included new severe impairments of ADHD, personality disorder, and the two referenced physical impairments.

than previously found by ALJ Lombardo, limiting him to light work, subject to the following non-exertional limitations:

> [He] is limited to performing low-stress job duties involving only simple, routine, repetitive tasks and no production-rate quotas. He should have no more than minimal interaction with the public or co-workers in the course of employment. The claimant should have no more than occasional interaction with supervisors.

(Tr. 464).

Based on the testimony of a vocational expert and considering Plaintiff's eleventh grade education, RFC, and record as a whole, the ALJ found that there were as many as 570,000 unskilled jobs in the national economy that Plaintiff remained capable of performing. (Tr. 471). Therefore, Plaintiff was not disabled. (*Id.*) The Appeals Council denied further review of this third ALJ decision, leaving ALJ Anschuetz's decision as the final decision of the Commissioner.

Returning to this Court, Plaintiff argues that the ALJ's 2016 decision should be reversed because ALJ Anschuetz failed to comply with this Court's instructions. Plaintiff asserts error only with respect to his mental impairments. For the reasons discussed below, I find no reversible error.

## II. Analysis

### A. Compliance With This Court's Remand Order

Plaintiff's core argument – that the most recent decision of ALJ Anschuetz fails to comply with this Court's Remand Order - significantly misconstrues and overstates this Court's prior directives in ways that cannot be reconciled with the record or applicable

law.  Plaintiff suggests that this Court's Order precluded the ALJ from any re-evaluation of "Dr. Oberlander's opinion as far as finding it unsupported by the evidence, …[or] the effect of [Plaintiff's] alcohol abuse on his mental impairments, and … [Plaintiff's] daily activities…."  (Doc. 14 at 2; *see also* Doc. 10 at 14).

Contrary to Plaintiff's assumptions, this Court's Remand Order did not require the ALJ to make any particular factual or legal findings, nor did the Court foreclose review of any issue.  In general, when this Court and/or the Appeals Council vacate a decision and remand for further proceedings under sentence four, the ALJ must consider all pertinent issues *de novo*.  *See Hearings, Appeals, and Litigation Law Manual (HALLEX)* I-2-8-18, *Administrative Law Judge Decision When Case Remanded By The Court*, 1993 WL 643058; *Wireman v. Com'r of Soc. Sec.*, 60 Fed. Appx. 570, 571 (6th Cir. 2003); *see also, generally,* 20 C.F.R. §§ 416.1455, 416.1477, 416.1481, 416.1484.

In support of his position that the ALJ was not permitted to consider any issues beyond the errors that led to remand, Plaintiff relies on *Mefford v. Garner*, 383 F.2d 748 (6th Cir. 1967).  However, that case is distinguishable.  In *Mefford*, the original Hearing Examiner determined that the plaintiff, a 55 year old extremely obese man with a second grade education, was not disabled because he had no severe impairments other than obesity and high blood pressure. The district court reversed, making specific factual findings that the plaintiff "was seriously afflicted with a heart condition which prevented him from carrying on" his past work as a coal miner, and further restricting him to light work.  Based on its findings, the district court remanded the case solely for

the purpose of determining the modern equivalent to Step 5 of the sequential analysis: "what kind of work claimant could do and whether such work was available to him in the area in which he lived." *Mefford*, 383 F.2d at 751. On remand, the Hearing Officer did not accept the restriction to light work or the court's finding that the plaintiff could no longer work as a coal miner. Instead, the Hearing Examiner "found that appellee was disabled in no way whatever from pursuing his customary work…." *Id.*, at 751–52. In light of the district court's specific findings and expressly limiting instructions on remand, the Sixth Circuit found legal error.

The *Mefford* court explained: "[I]t is the duty of the…agency … to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions…." *Id.* at 758. The appellate court stated when remand includes "specific directions, further proceedings in the…agency…must be in substantial compliance with such directions; and if the cause is remanded for a specified purpose, any proceeding[] inconsistent therewith is error…." *Id.,* at 758; *see also generally*, *Sullivan v. Hudson*, 490 U.S. 877, 886, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989) (holding that in cases where a court includes "detailed instructions," deviation from a court's remand order is itself legal error).

Over the past half century, the Sixth Circuit and other courts have clarified that in cases in which a remanding court has not made specific and detailed findings or given limiting instructions, an ALJ may conduct a *de novo* review. Likewise, an ALJ will not err by considering new issues that were not previously considered by the district court,

so long as the consideration is not "inconsistent with" the Court's Remand Order. *See, e.g., Hollins v. Massanari*, 49 Fed. Appx. 533, 2002 WL 31398968 (6th Cir. 2002), *Melkus v. Sullivan,* 902 F.2d 33, 1990 WL 58398 (6th Cir. 1990) (Table) (ALJ didn't act in contempt on remand in addressing issues that the court didn't address).

While *Mefford's* law of the case doctrine stands for the proposition that an ALJ may not act in a manner on remand that expressly or implicitly contradicts the remand order by the reviewing district court,

> the Sixth Circuit noted in *Hollins* that "[t]hese cases do not preclude the ALJ from acting in ways that go beyond, but are not inconsistent with, the district court's opinion." *Id*. Indeed, courts have found that "as long as an issue was not finally decided in the District Courts, the ALJ can exceed the scope of a remand order and reconsider any evidence deemed appropriate in reaching a decision regarding a claim." *Beatty v. Comm'r of Soc. Sec.*, 2015 WL 5693663 at * 3 (E.D. Mich. Sept. 29, 2015). *See also Drossman v. Comm'r of Soc. Sec.*, 2008 WL 1848202 at * 6 (N.D. Ohio April 17, 2008)(Carr, J.) (finding that "*Hollins* explicitly allowed ALJs receiving a case on remand to move beyond the issues examined in the district court opinion" and "ALJs should not feel constrained to only consider the limited issues previously presented and specifically remanded for further consideration.").

*Killings v. Colvin*, 2016 WL 2868699, at *13 (N.D. Ohio, 2016). As the district court in *Beatty v. Com'r of Soc. Sec.*, 2015 WL 5693663, at *3 (E.D. Mich., 2015) put it:

> [T]he Sixth Circuit made it clear in *Hollins…* that when analyzing a social security disability benefits case on review and the contested issue is independent of the factual determination of disability, the facts concerning the disability determination are not affirmed expressly or implicitly but are rather merely assumed in order to come to a decision regarding Plaintiff's claims.… Similar to this case, in *Hollins* the ALJ on remand conducted an entirely new hearing to re-determine the issue of disability, despite having a remand order that only addressed the issue of equivalency and literacy. In that case, the Sixth Circuit concluded that the merits were not decided, but instead, the only issues determined by the court were those narrow

ones addressed in the remand order. *Id* at *2. The facts concerning the merits were not expressly or implicitly, affirmed by the court, but were rather "assumed" so that the Court could evaluate the Plaintiff's claims. The Court needed to assume those facts to make a finding regarding Plaintiff's claims; thus the existence of the facts was necessary to the findings of the Court, but "the truth of those findings" was not. *Id.* As such, the facts were not explicitly or implicitly affirmed by the Court, and the ALJ remained free to revisit his determination under 20 C.F.R. § 404.983.

*Id.*, 2015 WL 5693663, at *3.

Returning to the R&R and the Remand Order adopting that R&R, it is clear that unlike *Mefford*, this Court did not limit the scope of remand to a Step 5 determination of what jobs remained following the determination of a specific RFC. Rather, the Remand Order was based on ALJ Lombardo's failure to properly analyze the medical opinion evidence, which led to errors at Steps 3, 4 and 5 of the sequential analysis. The failure to properly analyze the medical opinion evidence at Step 3 undermined the entirety of her decision. The only instructions provided on remand directed the ALJ to "[p]roperly assess and evaluate the opinion evidence" and to correspondingly re-evaluate whether Plaintiff met or equaled one of five mental health Listings at Step 3. Thus, ALJ Anschuetz was not precluded from conducting a *de novo* review of Plaintiff's claims for the entire adjudicated period, nor was he precluded from considering new evidence.

Plaintiff insists that the R&R underlying the prior Remand Order "clearly found that objective findings supported Dr. Oberlander's opinion." (Doc. 14 at 2). I disagree. While the R&R pointed to clinical records that "related to" Plaintiff's mental impairments, the undersigned did so to emphasize that in finding Dr. Oberlander's opinion to be "wholly inconsistent" with the record evidence, ALJ Lombardo appeared to "ignore[] the

objective findings" in those records.  (Tr. 677).  As in *Beatty*, the facts concerning the merits of Plaintiff's underlying claim were neither expressly or implicitly affirmed by this Court, but were rather "assumed" so that the Court could evaluate the Plaintiff's claims of legal error concerning the evaluation of the opinion evidence.  Despite focusing on the analysis of the opinions of Drs. Oberlander and Sparks, on remand this Court directed the ALJ to re-evaluate <u>all</u> medical opinion evidence.  (Tr. 672).

Plaintiff next argues that the ALJ was required on remand to find that Plaintiff's "substance abuse was not a material factor in determining whether or not [Plaintiff] was disabled by his mental impairments…." (Doc. 14 at 2).  He contends that the "effect of Mr. Wyatt's alcohol abuse was an issue *that was already considered by the Court.*"  (*Id.*, emphasis added)  Plaintiff draws this surprising conclusion from the undersigned's prior reference to a statement in Dr. Sparks' report that "despite the experience of drug abuse, [Plaintiff] does appear to experience a free-standing bipolar disorder."  (Doc. 10 at 14, citing Tr. 668).

Plaintiff again misinterprets the Remand Order.  First, the referenced statement in the R&R reflects no more than an acknowledgement that Dr. Sparks diagnosed Plaintiff with a bipolar disorder that is independent of his substance abuse.  Contrary to Plaintiff's misperception, the Court's Remand Order made no findings at all concerning the materiality of Plaintiff's substance abuse.  Rather, the undersigned directed the ALJ to reconsider all evidence relevant to five mental health listings, including Listing 12.09

(substance use disorders).[8]   Arguably, the R&R and subsequent Order overruling Plaintiff's objections clarified that the ALJ was <u>not</u> precluded from considering Plaintiff's substance abuse, including but not limited to "credibility issues surrounding Plaintiff's subjective reports to the examining psychologists." (Tr. 658).

In short, Plaintiff was not entitled on remand to have the ALJ consider only such evidence that might improve his chances of obtaining benefits.  While the ALJ obviously considered additional evidence in Plaintiff's favor (ordering a new psychological consulting exam and finding additional severe physical and mental impairments), the record in this case is filled with adverse evidence related to Plaintiff's substance abuse. The ALJ's decision to discuss this pervasive issue was not error.

Plaintiff's last asserted *Mefford* error is that the ALJ was somehow foreclosed from further reviewing his daily activities.  However, the error previously found by this Court was that ALJ Lombardo improperly focused on Plaintiff's daily activities "in isolation," without considering the record as a whole.  (Tr. 676, 678).  Thus, rather than being foreclosed from review, the ALJ was required to re-evaluate Plaintiff's statements and daily activities in the context of the totality of the evidence.

Overall, ALJ Anschuetz's detailed decision reflects an admirable attempt to not only comply with this Court's directives, but to reach a just decision that fully considers

---

[8]Listing 12.09 (substance use disorders) is appropriately evaluated only with reference to other listed impairments.  *See generally Buress v. Sec'y of HHS*, 835 F.2d 139, 140-141 (6th Cir. 1987).  A 1996 amendment to the Social Security Act provided that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).  Final rules enacted in 2016 have removed Listing 12.09 altogether.  *Revised Medical Criteria for Evaluating Mental Disorders*, 81 FR 66138-01 (Sept. 26, 2016).

the record as a whole. While the undersigned does not find ALJ Anschuetz's decision to be error-free, the undersigned finds no cause to reverse, and that the decision is supported by substantial evidence in the record as whole.

### B. This Court May Not Review the ALJ's Compliance With the Directives of the Appeals Council

Intertwined with Plaintiff's *Mefford* argument is a claim that ALJ Anschuetz allegedly failed to comply with the Remand Order of the Appeals Council, when it vacated ALJ Lombardo's second written decision. For example, Plaintiff asserts that the Appeals Council made a specific legal determination that Dr. Sparks' opinion was "based on substantial evidence," such that ALJ Anschuetz was foreclosed by the Appeals Council from rejecting his opinions.[9]

Consistent with the majority view on this issue, I conclude that whether ALJ Anschuetz complied with the directives of the Appeals Council's remand of ALJ Lombardo's second decision is not cognizable in this Court. ALJ Lombardo's second decision was vacated by the Appeals Council and was never reviewed by this Court. The Appeals Council expressly denied Plaintiff's request for further review of ALJ Anschuetz's decision. Therefore, the only decision currently before this Court is ALJ Anschuetz's decision. Because "the district court does not review internal agency-level

---

[9]Even if a reviewing court were to disagree and find jurisdiction to review ALJ Anschuetz's compliance with a prior Remand Order by the Appeals Council, the undersigned does not find the Appeals Council to have mandated adoption of Dr. Sparks' opinions any more than this Court mandated such a result. Substantial evidence is a relatively modest standard, described as "more than a scintilla of evidence but less than a preponderance." *Manefee v. Com'r*, 995 F. Supp.2d 820, 828 (N.D. Ohio 2014). The existence of substantial evidence in support of disability will not require reversal of an ALJ's adverse decision, so long as substantial evidence also supports the non-disability determination.

proceedings, it will not address whether the ALJ complied with the specific provisions of the Appeal Council's order of remand." *Riddle v. Astrue*, 2009 WL 804056 at *19 (N.D. Tenn. Mar. 25, 2009)(citing in part, *Dyer v. Sec'y of HHS*, 889 F.2d 682, 683 (6th Cir. 1989); *but see Long v. Com'r of Soc. Sec.*, Case No. 2:11-cv-343, 2012 WL 2156713 at *8 (S.D. Ohio June 13, 2012) (R&R discussing case law, and concluding that - assuming that court had authority to review the issue - the ALJ complied with Appeal Council mandate), adopted at 2012 WL 4009597 (S.D. Ohio Sept. 12, 2012).

### C.  The ALJ's Assessment of the Opinion Evidence and Findings On Plaintiff's Mental Limitations Are Substantially Supported

Although Plaintiff argues vociferously that ALJ Anschuetz failed to comply with this Court's Remand Order, Plaintiff's main objection is to the ALJ's assessment of the opinion evidence.  As the ALJ observed, "[i]t is difficult to reconcile the widely varying opinions of mental health sources concerning the extent of purported limitations imposed by existing mental impairment."  (Tr. 454; *see also* Remand Order at Tr. 657).

### 1.  Opinions Relevant to Step 3 and the B Criteria

Plaintiff asserts error in the ALJ's evaluation of the opinions of Drs. Oberlander and Sparks, since their opinions provided the most support for at least "marked" limitations relating to the B criteria of maintaining social functioning, and maintaining concentration, persistence and pace.[10]  Two findings of at least "marked" limitations in

---

[10]Plaintiff does not appear to argue to this Court that he has "marked" restriction in activities of daily living. Any such argument would be rejected as contrary to overwhelming evidence that supports less than marked limitation in that area.  Even Dr. Oberlander found only moderate limitations in that area, with most of the seven psychologists finding only mild limitations.  Likewise, there is no evidence of episodes of decompensation of extended duration.  Therefore, the undersigned limits discussion to the referenced

the B criteria would have supported a finding that Plaintiff met or equaled one of the referenced Listings at Step 3, so long as Plaintiff also demonstrated evidence that he otherwise met or equaled the Listing.[11]  However, ALJ Anschuetz found Plaintiff to have no marked limitations, with only "mildly" impaired in activities of daily living, and only "moderately" impaired in social functioning and in concentration, persistence, and pace. (Tr. 460-461).

Social security regulations dictate a hierarchy of presumptive weight to be given to opinion evidence, with "controlling weight" to be given to treating source opinions that are "'well-supported" and 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004)).  Next in the hierarchy is the weight given to consulting psychologists or physicians.  In general, more weight is given to a consultant who examines the plaintiff than to the opinions of a non-examining consultant.  *See* 20 C.F.R. §§404.1527(c)(1) and 416.927(c)(1). The regulatory presumptions are rebuttable.  Thus, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96–6p, 1996 WL 374180, at *3; *see also* 20 C.F.R. §

---

two functional areas of the B criteria.
[11]All mental health Listings also require a finding that Plaintiff met or equaled paragraph A of the Listing. Under section 12.04 (Affective Disorders), for example, the so-called A criteria are satisfied by medical documentation of bipolar syndrome with a history of episodic periods. Plaintiff presents no specific argument that he met any of the referenced Listings under Step 3, though the record includes relatively strong support that Plaintiff met the A criteria for bipolar disorder.

404.1527(c). The testimony of even a non-examining consultant can constitute substantial evidence to support the ALJ's decision when the expert's opinion is detailed and consistent with other medical evidence in the record. *Davis v. Chater*, No. 95–2335, 1996 WL 732298, at *2 (6th Cir. Dec. 19, 1996) and *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir.1989).

On the record presented, there are no "controlling" opinions from any treating psychiatrist or psychologist stating that Plaintiff has marked limitations in any of the B criteria. ALJ Anschuetz briefly referenced the opinion of Dr. Dorman, a treating family physician who last saw Plaintiff in 2006, more than a year before Plaintiff filed his last SSI application. (Tr. 449, noting that Dr. Dorman had opined that Plaintiff had no physical limitations preventing him from working"). However, Plaintiff presents no argument at all concerning Dr. Dorman's opinions, and his opinions do not support for Plaintiff's claim of "marked" limitations.[12]

The ALJ cited the regulatory hierarchy in considering the next most persuasive opinions, those of three different one-time examining consultants: Dr. Schulz, Dr. Sparks, and Dr. Twehues. Their opinions, presumptively of equal weight, contain significantly different findings with respect to the B criteria.

---

[12]Dr. Dorman stated that Plaintiff was not compliant with treatment for his ongoing mental illness, but nevertheless found no limitations in Plaintiff's activities of daily living. (Tr. 210-211). Though Dr. Dorman opined that Plaintiff had "poor frustration tolerance," he did not opine whether that frustration would result in mild, moderate, marked, or extreme limitations in the areas of social functioning or concentration, persistence, and pace. Similarly, while he opined that Plaintiff was seriously impaired "in interpersonal skills and absenteeism, due to poor judgment and unwise choices," he did not translate that statement to any particular level of impairment concerning the B criteria. (Tr. 214). On the whole, Dr. Dorman's limited opinions were consistent with the ALJ's moderate findings.

In his 11/16/06 report, Dr. Schulz concluded that Plaintiff's ability to relate to others (i.e., social functioning) was "moderately to severely impaired," based on Plaintiff's self-reported "frequent problems with bosses and coworkers." (Tr. 221). However, Dr. Schulz did not characterize the level of impairment as "marked" but instead opined Plaintiff could "relate sufficiently to co-workers on simple repetitive tasks." (*Id.*). In addition to his clinical interview, Dr. Schulz administered several psychological tests including IQ tests, leading to his conclusion that Plaintiff fell within the "borderline" range of intellectual functioning. He found Plaintiff's ability to maintain attention, concentration and pace to be only "minimally impaired for tasks within the borderline range…" (*Id.*) He determined that Plaintiff remained "capable of comprehending and completing routine tasks in a work setting." (*Id*). His attention and concentration were "adequate" for simple tasks. (Tr. 221-222; *see also* Tr. 458).

A year later, in his 10/31/07 report, Dr. Sparks provided strikingly different opinions concerning Plaintiff's limitations based on a 45 minute clinical interview that included several screening tests.[13] Plaintiff reported that he had had twelve beers the night before the evaluation, and uses marijuana "whenever it's around," approximately every other day.[14] (Tr. 307). Dr. Sparks observed that Plaintiff exhibited "relatively severe mania" at the time of the interview, and noted Dr. Dorman's prior report that Plaintiff's bipolar disorder was not adequately medicated, due to Plaintiff's failure to

---

[13]It appears that the tests were administered during the same 45 minute meeting.
[14]Plaintiff reported similar alcohol use and more extensive drug use to Dr. Schulz. He also reported that he no longer abused other drugs on a daily basis, including pain medications.

remain on mood stabilizing medication and many missed appointments. (Tr. 311). Dr. Sparks opined that Plaintiff appeared "marginally capable of living independently" even though he had "adequate decision-making abilities." (Tr. 310).

Dr. Sparks diagnosed bipolar disorder and substance abuse. In terms of Plaintiff's level of impairment, Dr. Sparks opined that Plaintiff was "extremely impaired" in his ability to relate to others, consistent with an "extreme" (more than marked) impairment in social functioning relative to the B criteria. (Tr. 312). Dr. Sparks further opined that Plaintiff was "extremely impaired" and in his ability to maintain attention to perform simple, repetitive tasks due to his "severe mania." (*Id.*) However, his ability to "understand, remember and follow instructions" was only "moderately impaired." Thus, although Dr. Sparks' opinion concerning Plaintiff's ability to maintain attention was partially consistent with more than marked limitations in concentration, persistent and pace, his opinion concerning Plaintiff's ability to understand, remember and follow instructions was equally consistent with only moderate limitations in that functional area. Dr. Sparks concluded that Plaintiff's ability to cope with work stress was markedly impaired.

Just eleven days after Dr. Sparks' examination, Plaintiff was admitted to the hospital for suicidal ideation, presenting the same state of mania with similar symptoms to those observed by Dr. Sparks. On admission, his Global Assessment of Functioning ("GAF") was assessed at 25, a level incompatible with work. (Tr. 327). However, he

was discharged four days later after being started on mood stabilizing medications for his bipolar disorder, with a GAF at discharge of 65, consistent with mild symptoms.[15]

After remand from the Appeals Council, Plaintiff was referred to a third examining consultant, Dr. Twehues. On the basis of her 1/12/16 examination, Dr. Twehues diagnosed bipolar disorder, an unspecified anxiety disorder, ADHD, an unspecified personality disorder with anti-social features, alcohol use disorder in "sustained full remission," and moderate cannabis use disorder. (Tr. 1443). Plaintiff also admitted a history of prescription drug abuse. Dr. Twehues diagnosed "full remission" of Plaintiff's alcohol use disorder based on Plaintiff's report that his current alcohol use was only occasional, in contrast to his admitted daily consumption of a fifth of vodka and a case of beer up until five years previously. (Tr. 1440). Dr. Twehues opined that Plaintiff is able to follow simple instructions, but might experience mild-to-moderate difficulty understanding and retaining instructions for complex, multi-step tasks. (Tr. 1436). These findings are consistent with the ALJ's finding of only moderate limitations in maintaining concentration, attention, and pace. However, Dr. Twehues opined that Plaintiff had "marked" impairment in interacting appropriately with the public, with supervisors, or with co-workers, consistent with a "marked" impairment in social functioning. She also opined that his ability to respond appropriately to usual work situations and to changes in a routine work setting is "extremely" impaired. (Tr. 1437).

---

[15]The ALJ pointed out multiple other GAF scores that indicated mild to moderate symptoms (Tr. 457). Although GAF scores are not definitive, it is not error for an ALJ to consider them.

In addition to the three examining consultants, ALJ Anschuetz assessed four additional medical opinions dated from 2006-2009, offered by Drs. Goldsmith (11/28/06), Meyer (11/21/07), Waggoner (04/02/08), and Oberlander (12/11/09). Of those four psychologists, Plaintiff makes much of the fact that Dr. Oberlander was called as a medical expert at his first hearing. However, as a non-examining consultant, Dr. Oberlander's opinions were entitled to no more and no less presumptive weight under the regulations than the opinions of the three other non-examining psychologists, all of whose opinions contrasted sharply with those of Dr. Oberlander. Drs. Goldsmith, Myer, and Waggoner each opined that Plaintiff has only mild restrictions in activities of daily living, and moderate restrictions in maintaining social functioning and in maintaining concentration, persistence and pace. (Tr. 237, 346, 364).

As stated, Dr. Oberlander opined that Plaintiff met or equaled multiple mental health Listings at Step 3, based on at least two "marked" impairments in his functional abilities to engage in social interaction, and to engage in activities that require concentration, attention, and persistence. (Tr. 594). When questioned about the basis for his opinions, Dr. Oberlander explained that he relied in large part on the report of Dr. Sparks, including Plaintiff's statements to Dr. Sparks, as well as Plaintiff's "symptomology" eleven days after Dr. Sparks' examination, when Plaintiff was briefly hospitalized. (Tr. 596). Shortly after the hearing, Dr. Oberlander submitted interrogatory responses affirming his opinions. (Tr. 428).

Once again, this Court is required to review whether the ALJ's evaluation of the medical opinion evidence comported with applicable law, and whether his determination that Plaintiff did not suffer from "marked" limitations in both social functioning and in concentration, persistence and pace is supported by substantial evidence in the record as a whole. This time, I conclude that ALJ Anschuetz complied with the law, and that his findings on the B criteria are supported by substantial evidence.

In seeking a contrary conclusion, Plaintiff begins by asserting that because this Court previously found error in ALJ Lombardo's rejection of the opinions of Drs. Oberlander and Sparks, ALJ Anschuetz was required to accept their opinions in full. As discussed, however, the Court's Remand Order contained no such mandate.

ALJ Anschuetz acknowledged that his "analysis cannot be accurately done without acknowledging the claimant's history of drug abuse, alcohol abuse and drug-seeking behavior (i.e., misuse of prescribed narcotic pain medication)." (Tr. 454). After relating some of the pervasive evidence relating to that history, the ALJ re-evaluated the medical opinion evidence in an effort to determine which assessment(s) were the most reflective of Plaintiff's level of impairment at Step 3 (focusing on the B criteria), and to determine Plaintiff's RFC at Steps 4 and 5. (Tr. 457).

The ALJ gave Dr. Schulz's opinions the greatest weight among the three examining psychologists. He gave Dr. Schulz's opinions "substantial weight," because they were "generally consistent with the other evidence of record." (Tr. 459-459). Dr. Schultz's findings support the ALJ's determinations of less than "marked" limitations in

both the areas of social functioning and in concentration, persistence, and pace, and no more than mild limitations in activities of daily living.[16]  However, the ALJ also gave "significant weight" to the findings of Dr. Twehues that Plaintiff's thoughts were adequately organized, logical, coherent and goal-directed, that Plaintiff was alert, oriented, and responsive and cooperative, and that he is able to follow simple instructions but may have mild-to-moderate difficulty with complex, multi-step tasks. (Tr. 459).  In addition, the ALJ gave significant weight to Dr. Twehues's opinion that Plaintiff would have mild or moderate limitation in work-related abilities pertaining to understanding, remembering, and carrying out instructions. (*Id.*)  The ALJ gave "less weight" to Dr. Twehues's conclusions that Plaintiff was "markedly" impaired in social functioning and "extremely" impaired in his ability to respond to changes in a routine work setting.  (Tr. 459).  Last, the ALJ gave "little weight" to the opinions of Dr. Sparks.

Of the four non-examining consultants, the ALJ gave Dr. Oberlander's opinions "little-to-no weight," and instead gave "much more weight" to the consistent opinions of Drs. Goldsmith, Myer, and Waggoner, whose opinions he found "without a doubt more credible" than those of Dr. Oberlander.  (Tr. 457-458).

I find no factual or legal error in ALJ Anschuetz's evaluation of any of the medical opinion evidence, which was both extensive and thorough.  (*See* Tr. 450-466).  Unlike ALJ Lombardo, ALJ Anschuetz did not base his rejection of the opinions of Dr. Sparks

---

[16]Curiously, Plaintiff asserts that the ALJ "erred in rejecting the opinions of the defendant's own evaluating psychologists, Drs. Schulz, Sparks, and Twehues."  (Doc. 10 at 18).

solely because they were based on subjective reports.  As Judge Beckwith previously explained:

> "An ALJ may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self-reports that have been properly discounted as incredible."  *Tornmaseth v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Morgan v. Commissioner Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)).  In other words, the ALJ cannot reject medical opinions based on the subjective reports of the claimant solely because they are based on the subjective reports of the claimant.… The ALJ may, however, reject medical opinions based on the patient's self-reports where the reports themselves lack credibility or where the claimant is not credible.  In this case, as the Commissioner sets forth in detail in her brief, there are [a] number of credibility issues surrounding Plaintiff's subjective reports to the examining psychologists.  The ALJ - not the Court – is responsible for resolving those credibility issues and re-evaluating the weight to which opinions based on Plaintiff's self-reports are entitled.

(Tr. 657-658).

ALJ Anschuetz recognized that the B criterion that was "open to most debate and controversy" among the seven psychologists was Plaintiff's ability to maintain social functioning. (Tr. 460).  I find the existence of substantial evidence to support the ALJ's assessment of social functioning as only "moderate" rather than "marked."  Previously, the undersigned found ALJ Lombardo's assessment to be in error, based on her inappropriate focus on Plaintiff's activities "in isolation" without considering the record as a whole.  In re-evaluating the record, ALJ Anschuetz did not repeat that error, but instead reviewed Plaintiff's statements and activities in the context of the record as a whole, before concluding that Plaintiff had less than marked restrictions in social

functioning and in concentration, persistence and pace.[17] (*See, e.g.*, Tr. 444, 449-452, 454-458, 460).

In contrast to ALJ Lombardo's more cursory analysis, ALJ Anschuetz cited numerous examples supporting his conclusion that Dr. Sparks' opinions were "inherently inconsistent" with the record, and of "dubious value and questionable origin." (Tr. 455, 458, 459). "For example, Dr. Sparks classified the claimant as cooperative, noted that [he] does odd jobs with a friend to make money, enjoys singing, lives with his girlfriend and her daughter, and has 'adequate decision-making abilities,' yet he concluded that the claimant is only 'marginally capable of living independently.'" (Tr. 459). At the time he was examined by Dr. Sparks, Plaintiff was heavily abusing drugs and alcohol and was not taking prescribed medication for his bipolar disorder or receiving any mental health treatment. (Tr. 451). By contrast, medical records reflected that when Plaintiff abstained from substance abuse and was compliant with his prescribed mood-stabilizing drugs and psychotherapy, his level of functional impairment dramatically decreased. (*See* Tr. 455, 460, 461 (citing records)). "[I]t appears that the claimant's mental symptoms would be subject to effective control with the proper use of prescribed psychotropic medication and his abstinence from drug and alcohol use." (Tr. 457). The ALJ also explained why he did not find Plaintiff's statements to Dr. Sparks to be credible, and did not find Plaintiff's statements about his level of impairment

---

[17]The evidence of "marked" impairment in Plaintiff's ability to maintain concentration, persistence, and pace is weaker than the evidence in favor of a marked or extreme impairment in social functioning. Only Dr. Oberlander found "marked" impairment in concentration, persistence and pace. Dr. Sparks' opinions were more mixed in relation to that functional area, and the remaining five consultants, including Dr. Twehues, found only mild to moderate limitations.

generally to be credible. (*See* Tr. 460). Dr. Sparks found "extreme" impairment in social functioning, but the ALJ explained why he found that opinion to "vastly" overstate Plaintiff's level of impairment in that functional area, not only based on the contrary reports of Drs. Schulz, Goldsmith, Myer, and Waggoner, but also based on other evidence "within the context of the entire record." (Tr. 459).

In addition to his reliance on Dr. Sparks' opinions, Plaintiff relies most heavily upon Dr. Oberlander's opinions in this judicial appeal, both because the prior remand rested largely on the improper evaluation of those opinions by ALJ Lombardo, and because Dr. Oberlander (alone among all seven consulting psychologists) opined that Plaintiff had two "marked" impairments in the B criteria, and met or equaled multiple mental health Listings. Plaintiff argues that the ALJ should have given Dr. Oberlander's opinions greater weight because he reviewed a more complete record than the other three non-examining consultants. However, Dr. Oberlander testified that in formulating his opinions, he relied chiefly on Dr. Sparks' opinions, Plaintiff's statements to Dr. Sparks, and Plaintiff's "symptomology" when he was admitted for a brief psychiatric hospitalization eleven days later. In evaluating opinions, an ALJ is not required to adopt the latest-as-greatest, so long as he adequately explains the basis for giving greater weight to earlier opinions, and considers the later evidence of record, as the ALJ did here.

While the undersigned will not go into the level of detail that ALJ Anschuetz did, a review of the record easily confirms that substantial evidence supports the ALJ's

decision to reject Dr. Sparks' and Dr. Oberlander's opinions that Plaintiff suffers from at least "marked" impairment in social functioning when he complies with prescribed treatment. As the ALJ pointed out, Plaintiff's statements and activities were generally inconsistent with a "marked" level of social impairment. Plaintiff testified that he played in a band for many years, up until about 2012, in bars around Trenton and Middletown, that he got along with his bandmates and has friends (but denied "close friends" except for his girlfriend and father). (Tr. 567-568). Plaintiff reported enjoying performing on stage and at special benefits, (Tr. 467), though he testified that he eventually quit his band because they were into "more and more drugs." He testified that he would obtain free drugs from people he knew by walking around town, though sometimes he would purchase them. (Tr. 456). He testified that he has "been around people, all my life, playing [guitar], around the church groups," and that he has been "blessed" with a good singing voice. (Tr. 576). He sings weekly with others. (Tr. 456). At one hearing, he claimed that "the only people I could be around are church people; but other than that [social] functioning is nothing." (Tr. 514). In 2014, he was taking his son to church every Wednesday and Sunday.[18] (Tr. 572). In 2016, he had lost his license and was getting rides to church from a friend. (Tr. 511, 514-515, 528).

When questioned about his many friends and social interactions, Plaintiff explained that he mainly has trouble getting along with other people in work settings.

[18]Plaintiff currently has custody of his son, but his son lives with a family member. The child is a product of Plaintiff's relationship with a previous girlfriend. In 2016, the mother of his son was in prison for embezzlement. (Tr. 500, 1328).

(Tr. 567-568). However, in contrast to that testimony, Plaintiff described himself as "a manual laborer" who works for a day or two at a time whenever he is asked, mostly by friends, people he knows, or friends of people he knows. He has worked as a helper in roofing, general construction, landscaping, loading boxes, as a mover, and doing other odd jobs. (Tr. 464, 565, 568, 578, 501-502). He doesn't look for more work because he is "not qualified" for most jobs. He also testified that his current girlfriend has encouraged him to get a job, but doesn't work consistently because "people don't always have the money to fork out for you," and he usually works "under the table…with cash money." (Tr. 578). At his last hearing before the ALJ, he explained that he does not need to work because his girlfriend takes care of all his bills. (Tr. 499-500). Though he testified that he gets panic attacks in crowds, that assertion was not supported by the medical records. His band performances also undercut his testimony, as did his report that he took his friend's daughter to a Motley Crue concert to help her cope with her father's death from a heroin overdose. (Tr. 458). Plaintiff reported to Dr. Schulz that he gets along adequately with people in the community and that he is "comfortable being around people." He also told Dr. Schulz that he goes out with his girlfriend in the evening, and maintains contact with family members both by phone and in person. He was cooperative when examined. (Tr. 455). The above is just a small portion of the extensive record on which the ALJ relied to find only "moderate" limitations in social functioning.

The third error identified in ALJ Lombardo's first decision was her inappropriate focus on Plaintiff's activities "in isolation." Plaintiff asserts that ALJ Anschuetz repeated that error. I disagree.

Unlike ALJ Lombardo's first decision, which appeared to simply ignore evidence that was consistent with Dr. Oberlander's (and by inference, Dr. Sparks') opinions, ALJ Anschuetz extensively discussed the record as a whole and why he viewed Dr. Oberlander's extreme opinions as contrary to that evidence. The ALJ reasonably concluded that, like Dr. Sparks, Dr. Oberlander's opinions failed to take into account the credible symptoms that would remain when Plaintiff complied with prescribed treatment and abstained from drugs and alcohol. Dr. Oberlander also heavily focused on Plaintiff's limited cognitive abilities, but the ALJ found that many examples of "mental acuity" (including Plaintiff's pursuit of narcotic pain medication) "belie a finding of mental limitation or cognitive deficit of [the] severity …suggested by Dr. Oberlander." (Tr. 454). He possessed "sufficient mental acuity to obtain money from his fiancée or other sources to purchase cigarettes, drugs, and alcohol." (Tr. 456). Notwithstanding the finding of borderline intellectual functioning, the ALJ pointed out multiple reports of mental health professionals who assessed Plaintiff with intellectual functioning in the average range, with no cognitive impairment. (Tr. 463). In 2006, Plaintiff was working in the music profession and was considering moving to Tennessee to record an album, Plaintiff worked fairly frequently throughout the claimed disability period in "odd jobs,"

and evidence suggested that with treatment and abstinence from drugs and alcohol, Plaintiff's symptoms were much improved. (Tr. 454-455, *see also* Tr. 1248).

Plaintiff argues that the ALJ misinterpreted some evidence, pointing out that Dr. Sparks observed "some grandiosity" during his evaluation, a trait common in bipolar disorder. However, medical providers regularly noted the absence of delusions or grandiosity. Still, Plaintiff protests that there "is nothing in the record that indicates that [he] had the intellect or ability to go to Tennessee and cut a record," and that his statement should have been considered symptomatic of his impairment. (Doc. 10 at 15). Plaintiff also is critical of the fact that the ALJ highlighted that Plaintiff's girlfriend believes he is a "liar," again suggesting that his "lies" "could be the result of his grandiosity that is manifestation of a manic episode …and not willful lying." (Doc. 10 at 15, emphasis added).

Plaintiff's arguments grasp at straws. Without explicitly challenging the ALJ's highly adverse (and well supported) credibility finding, Plaintiff mounts an implicit challenge to that finding based on speculative arguments that all statements used against him were a manifestation of his illness, while simultaneously arguing that the ALJ should have credited all statements that supported his claim of disabling symptoms.[19]

---

[19]As Defendant points out, the social worker who recorded Plaintiff's musical ambitions stated that he was "alert and oriented" at the time he made the statement about moving to Tennessee, and appeared to regard it as credible. (Tr. 274).

In a similar vein, Plaintiff asserts that the ALJ erred in referencing Plaintiff's "under the table" work and "odd jobs," which the ALJ found to be inconsistent with disability. He argues that medical records reflecting that he hit his hand with a hammer, fell off a roof, and fell off a horse, "support a finding of disability" because they show how his "impulsiveness and lack of focus resulted in injuries when he tried to perform work activity." (Doc. 10 at 16). He contends that this is consistent with the opinions of Drs. Sparks and Oberlander. In addition, Plaintiff argues that there is no evidence that his odd jobs constituted substantial gainful activity. He stresses his self-serving testimony that he tried to work but couldn't hold a job for long because of his problems getting along with people.

Plaintiff further claims that the ALJ erred by reasoning that "[i]f, in fact, the claimant exhibited mental symptoms of a severity as suggested by Dr. Oberlander, it would be highly unlikely that he would be capable of helping to maintain a household or that he would have a fiancée willing to tolerate his continued lack of any meaningful activity (e.g., purportedly, nothing of consequence beyond looking out the window and listening to music). (Tr. 508). Although the undersigned agrees that the ALJ's speculation about what Plaintiff's domestic partner would "tolerate" strayed beyond the record, this minor error is harmless in light of other substantial evidence in the record.

In sum, none of Plaintiff's arguments are persuasive. The undersigned has already explained why the ALJ's assessment of the opinion evidence and findings of "moderate" rather than "marked" limitations in the referenced B criteria were supported

by substantial evidence. The fact that evidence can be found to support a different conclusion provides no grounds for reversal. Additionally, the ALJ never equated Plaintiff's work activity with SGA, but instead used it (and a wealth of other relevant evidence) to support the adverse credibility finding and ultimately, the conclusion that Plaintiff is not disabled. *See Miller v. Com'r*, 524 Fed. Appx. 191, 194 (6th Cir. 2013).

### 2. Plaintiff's Mental RFC

Having concluded that the ALJ properly assessed the opinion evidence and the B criteria, it follows that, at Steps 4 and 5 of the sequential analysis, ALJ Anschuetz's decision is supported by substantial evidence. The "paragraph B" criteria involve broad functional categories and are used only at Step 3 of the sequential analysis. Once an ALJ has determined that a plaintiff's mental impairments do not satisfy the B criteria, he must go on to evaluate a plaintiff's residual functional capacity, which requires a much more detailed assessment of the work-related limitations that might result from the B criteria findings. (Tr. 463, citing SSR 96-8p). The ALJ reviewed the opinion evidence a second time in determining Plaintiff's physical and mental RFC, translating Plaintiff's mild impairment in activities of daily living and moderate impairments in social functioning and in concentration, persistence and pace into appropriate work limitations. Plaintiff argues briefly that the ALJ erred when he rejected the opinions of Drs. Sparks and Twehues that suggested that he could not tolerate changes in work routine, or other work-related stress. However, the ALJ adequately explained his rationale for rejecting their opinions and support for the RFC as determined. "It is difficult to understand how

an individual who engages in such activities would be "extremely" impaired in his ability to respond to changes in a routine work setting – by its very nature, the claimant's work doing odd jobs would necessarily involve almost constant change." (Tr. 460; *see also generally.* Tr. 454-469).

### D. Substance Abuse

The ALJ found that Plaintiff's bipolar disorder and personality disorder were "likely adversely influenced by his history of substance abuse." (Tr. 449). The ALJ also noted that it appeared that Plaintiff's "mental impairments would be subject to effective control with the proper use of prescribed psychotropic medication and his abstinence from drug and alcohol use." (Tr. 457). "[I]t appears likely, if not probable, that the severity of any documented mental impairment is exacerbated by the claimant's periodic abuse of alcohol and/or drugs (either use of illegal drugs such as heroin, cocaine or marijuana and/or misuse of prescribed narcotic pain medication). When not abusing drugs and/or alcohol, the claimant appears able to function quite effectively." (Tr. 460).

Plaintiff's primary argument concerning his substance abuse is that ALJ Anschuetz should have been foreclosed from considering the issue at all. That argument is rejected for the reasons previously stated.[20] In a more cursory fashion, Plaintiff argues that the ALJ "erred in finding that with abstention from drugs and alcohol

---

[20]For the same reasons, the undersigned rejects Plaintiff's assertion in his reply memorandum that this Court previously found that "objective findings supported Dr. Oberlander's opinion, that Mr. Wyatt's substance abuse was not a material factor in determining whether or not Mr. Wyatt was disabled by his mental impairments…." (Doc. 14 at 2).

and with proper treatment, his mood "stabilized." (Tr. 455). Plaintiff points to the examination findings of Dr. Twehues to support his contention that his symptoms were both severe and disabling, even after he abstained from drugs and alcohol.

Plaintiff began drinking at the age of 13, and began using drugs at the age of 14. Plaintiff admitted to Dr. Twehues in January 2016 that he continued to use alcohol "occasional[ly]" and remained dependent on marijuana. At the time he was seen by Dr. Twehues, he reported participating in pain management with prescriptions for Valium and Percocet. Shortly before entering pain management, Plaintiff quit treatment with a doctor who "wasn't willing to help me out with any more pain medication." (Tr. 532). Despite claiming to be sober, Plaintiff admitted he continued to drink alcohol. In February 2016, he credited his girlfriend of 3 years with helping him to abstain, explaining that if he decided to go drinking, "I'm not allowed to come back to the house that night," which had happened "a few times….here and there" for "one or two days." (Tr. 510). Thus, Dr. Twehues's finding that Plaintiff's alcohol abuse was in "full remission" is contrary to the evidence. As the ALJ states: "While there are some references to the claimant's substance abuse being in possible remission, that appears unlikely and, even if true, such remission has not been sustained." (Tr. 462). Moreover, the ALJ's assessment of the opinions of Drs. Twehues, Sparks, and Oberlander reflects no legal or factual error.

Notwithstanding the undersigned's conclusion that the ALJ did not err in discounting their opinions, Plaintiff returns to the opinions of Drs. Sparks and

Oberlander to support his claim that his symptoms remained disabling during compliance with treatment and sobriety. Dr. Sparks examined Plaintiff in 2007 when Plaintiff was heavily abusing both drugs and alcohol and receiving no treatment, but nevertheless opined that Plaintiff would suffer from disabling symptoms even if substance use factors were excluded. (Tr. 312). However, the ALJ pointed to post-2007 evidence that Plaintiff's symptoms were much less severe when he received treatment and abstained from substance abuse.

Dr. Oberlander chiefly relied on Dr. Sparks' report. When questioned whether Plaintiff's alcohol and substance abuse was "material" to his findings, Dr. Oberlander opined that in individuals with borderline intellectual functioning such as Plaintiff, "the materiality of substance use is really less of a significant contributing factor than in cases where one's cognitive functioning is less impaired," and that Plaintiff's limitations would remain even "with a brief cessation of substance use." (Tr. 594-595). Aside from the conclusion that Dr. Oberlander's extreme opinions were properly discounted, his opinion on substance abuse is undermined by both the ALJ's finding that Plaintiff is less cognitively impaired than found by Dr. Oberlander, and by the fact that Dr. Oberlander assumed only a "brief" cessation of substance use.

Although Plaintiff was not a credible witness, his own statements also supported the ALJ's findings that his symptoms were less severe when he abstained from drugs and alcohol. (*See* Tr. 580, testifying that drinking and drugs would "intensify" his symptoms "to be worse, yes.") He testified that his doctors had not yet found the "right

medication" to stabilize his moods, (Tr. 579-580), but records suggested that Plaintiff's moods were stable when he remained compliant on mood-stabilizing medications and was not abusing drugs and alcohol. (Tr. 468-469; *see also* Tr. 1248-1286, 1328-53, 1554-61).

The Social Security Act precludes an award of benefits if alcohol or drug abuse is "a contributing factor material to the Commissioner's determination that an individual is disabled." 42 U.S.C. §§423(c)(2)(C), 1382c(a)(3)(J). Regulations that implement this standard "require that the sequential evaluation process be followed in adjudicating disability before any consideration is given to whether drug addiction is the cause of such disability." *Williams v. Barnhart*, 328 F. Supp.2d 849 (N.D. Tenn. 2004); SSR 13-2P. In this case, the ALJ never reached the "materiality" analysis because he did not find Plaintiff to be disabled in the first instance. Although cases like *Williams v. Barnhart* stand for the proposition that remand *may* be warranted if an ALJ improperly conflates the materiality analysis with the initial sequential evaluation of disability, Plaintiff has waived any possible error through his failure to assert such a claim before the undersigned.

In any event, the plaintiff bears the ultimate burden of proving that his substance abuse is not a contributing factor material to his disability, and any possible error on the record presented appears to have been harmless. *Belser v. Com'r*, 2015 WL 2452436 at *11 (S.D. Ohio, May 21, 2015)(Black, J.) (concluding that non-disability finding was supported by substantial evidence, where ALJ drew comparisons between bipolar

plaintiff's functionality during periods of sobriety and periods of substance abuse); *Bartley v. Barnhart*, 117 Fed. Appx. 993 (6th Cir. 2005) (plaintiff failed to prove disabling mental limitations during times when he stopped using drugs); *Watkins v. Astrue*, 2010 WL 3360428 (D.S.D. Aug. 23, 2010)(procedural error harmless on record presented); *Schopplein v. Astrue*, 2008 WL 4368798 (E.D. Ky. Oct. 14, 2008)(same).

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT**: 1) The decision of the Commissioner to deny Plaintiff DIB and SSI benefits be **AFFIRMED** because it is supported by substantial evidence in the record as a whole; and 2)   As no further matters remain pending for the Court's review, this case be **CLOSED.**


*/s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JONATHON R. WYATT,                                    Case No. 1:16-cv-938

       Plaintiff,                                    Black, J.
                                                      Bowman, M.J.

   v.


COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).